Ira P. Rothken, CA SBN 160029
Rothken Law Firm LLP
Three Hamilton Landing, Suite 280
Novato, CA  94949
Telephone:  (415) 924-4250
Facsimile:  (415) 924-2905
Email: ira@techfirm.com

Attorneys for Defendants
Voice Media Incorporated, Trade News NV
and Internet Business Services LLC

David S. Olson  CA SBN 127264
CLARK & TREVITHICK
800 Wilshire Blvd., 12th Floor
Los Angeles, CA 90017
Telephone: 213-629-5700
Facsimile: 213-624-0441
Email: dolson@clarktrev.com

Attorneys for Plaintiffs
Xplor Media, Inc. and New Destiny Internet Group LLC

## UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| NEW DESTINY INTERNET GROUP, LLC, et al.,<br><br>               Plaintiffs,<br><br>    v.<br><br>VOICE MEDIA INCORPORATED, et al.,<br>               Defendants. | Case No.:  2:04-cv-894 CBM (CWx)<br><br>**JOINT CASE MANAGEMENT STATEMENT; REQUEST FOR TELEPHONIC APPEARANCE BY DEFENSE COUNSEL [F.R.C.P. 26(f) and LR 26-1]**<br><br>**Judge: Hon. Consuelo B. Marshall**<br>**Date:**      **June 3, 2008**<br>**Time:**      **10:15 a.m.**<br>**Ctrm:**      **2** |

492891.1 (N15391.600)          -1-

Case No.:  2:04-cv-894 CBM (CWx)

The parties, by and through their counsel of record, hereby submit their joint report under Rule 26 of the Federal Rules of Civil Procedure and Local Rule 26-1 and pursuant to the Court's order of May 19, 2008. The parties met and conferred regarding the issues contained in Federal Rule 26 and LR 26-1 between May 26-29, 2008 via the mutual drafting and editing of this statement, and related communications pertaining to the same.

**I. Matters Pursuant to L.R. 26-1**

**a.     Complex Cases:**

The parties do not believe that this case requires the judicial oversight contemplated by the Manual for Complex Litigation.

**b.     Motion Schedule:**

<u>Defendants' position:</u>  Defendants believe that preliminary determinations and narrowing of issues are required via pleading and motion practice at the outset of further litigation of this matter.

Initially, the stay ordered on December 9, 2004, must be formally lifted in order for litigation to re-commence.

The currently effective complaint is plaintiffs' First Amended Complaint, filed by plaintiffs on May 14, 2005, to which defendants have yet to respond. Plaintiff's Second Amended Complaint was stricken by the Court on June 7, 2004, for failure to comply with local rule 7-3. On June 3, 2004, the Court ordered New Destiny Internet Group's ("NDIG") claims to arbitration and the remainder of the case stayed.

In light of the elimination of NDIG's claims through binding arbitration and the potential impact of the findings and orders in the arbitration to this action, defendants request that plaintiff Xplor be required to provide defendants with a proposed Second Amended Complaint ("SAC") by June 7th, 2008 and to meet and confer with defendants by June 20th, 2008 to determine if the parties could stipulate to its filing (in order to prevent unfair prejudice amongst other things) or whether plaintiffs will need

to seek the permission of the Court by way of motion for its filing which motion shall be filed by June 27, 2008.  If defendants stipulate to plaintiff Xplor's filing of the SAC then upon filing and service of such Second Amended Complaint, Defendants request twenty (20) days thereafter to file responsive pleading(s).

Defendants anticipate, amongst other possibilities, a motion to dismiss or motion for summary judgment based upon the collateral estoppel effect of the arbitrator's findings and ruling in the arbitration (See Final Arbitration Order of Justice Neal (ret) attached herein as Exhibit "A")  between defendants and NDIG. The arbitrator found, amongst other things, that New Destiny ("NDIG") authorized the use of the "Homegrown" mark(s) and related content at issue. NDIG and Xplor are under the same common control group and have a significant overlap in ownership. A threshold issue, amongst others, is whether Xplor can assert under Rule 11 in its purported Second Amended Complaint that its common control sister company New Destiny, involving substantially the same decision makers as Xplor, was not authorized to license use of the Homegrown mark(s)  to the respective Defendant(s).

Defendants anticipate filing a motion for summary judgment after they have had an opportunity to conduct discovery if the matter is not resolved at the pleading stage.

Plaintiffs' position: Plaintiff Xplor is agreeable to filing a Second Amended Complaint on or before June 27, 2008. Plaintiff New Destiny's claims against defendants were recently settled and plaintiff New Destiny will not be a plaintiff in the Second Amended Complaint.

Plaintiff Xplor, which was not a party to the arbitration proceedings, will oppose any motion to bind it based on the arbitrator's supposed findings or rulings in that proceeding, which was informal in nature and not transcribed or subject to judicial review in light of the settlement.

Xplor also anticipates filing a motion for summary judgment at an appropriate time in the future.

**c.    Settlement:**

<u>Plaintiff's position:</u>        Xplor believes that any settlement could be effected by counsel and the parties and does not believe mediation would add anything but additional expense.

<u>Defendants' position:</u>      Defendants would agree to mediation of this case after the issues remaining have been identified and some basic discovery has been conducted.  Defendants propose mediation within 60 days after responsive pleadings have been filed.

**d.    Trial Estimate:**

<u>The plaintiff</u> estimate that a jury trial will take approximately 5-7 court days.

<u>The defendants</u>, not fully understanding what claims if any could remain are uncertain as to how a long a jury trial would be.

**e.    Additional Parties**:

<u>Plaintiff's position:</u>        Plaintiff proposes a cut-off date for amending pleadings, adding additional parties, and bringing cross-claims of August 1, 2008.

<u>Defendants' position:</u>      Defendants are uncertain about what plaintiff's claims remain after the arbitration and thus are unable to gauge and therefore respectfully withhold any cutoff (until a future status conference) on their rights to amending pleadings, adding additional parties and bring cross-claims or claims for indemnity amongst other related pleadings. Defendants are not opposed to plaintiff having a cut off of August 1st, 2008 above for its pleadings but given that defendants will very likely be bringing a motion to dismiss in July 2008 it would not be fair for it to have a cut off on its own pleadings until well after it had an opportunity to understand the issues and perform discovery.

**f.      Expert Witnesses:**

<u>Plaintiff's position:</u>      Xplor intends to designate expert witnesses on the issue of damages and operation of internet businesses.

<u>Defendants' position:</u>      Defendants plan to designate expert witnesses who will testify at trial regarding liability and damages.

**II. Matters Pursuant to FRCP 26(f)**

**(1)      Initial Disclosures.**

The parties propose initial disclosures be exchanged 30 days after responsive pleadings are filed <u>and</u> motions to dismiss (or other attacks on the pleadings) are decided in order to provide greater clarity as to what issues remain post arbitration and thus what the scope of such disclosures ought to be – this will provide for greater economic efficiency and proportionality.

**(2)      Subjects On Which Discovery Is Needed**

<u>Plaintiff's position:</u>      Discovery is needed on (without limitation) issues pertaining to liability and damages, including profits derived by defendants from the use of the Xplor mark, whether via the homegrownvideo.com site or other websites owned and operated by defendants.

<u>Defendants' position:</u>      Discovery is needed on (without limitation) issues pertaining to liability and damages, including (without limitation), the common control of New Destiny and Xplor, plaintiff's agreements, course of performance, and licenses related to any marks at issue and given that the arbitrator found that defendants had authorization to use the Homegrown mark provided by New Destiny (and those in control of it) whether Xplor, which is under common control with New Destiny, is estopped or precluded from making any claims contrary to such arbitrator findings in this Federal Court proceeding. Defendants believe that if and when discovery moves forward it

should be staged and the first stage would be liability and then motions for summary judgment should be heard and if the motions do not lead to a defense Judgment then discovery should proceed on damages related to the remaining claims in preparation for trial – this will help maximize cost efficiency as it make little if any sense to go through the intrusive exercise of providing financial documents under the rubric of "damages" and engaging financial experts if there is no liability in the first instance – especially given the Arbitrator's Final Order.

**(3)    Electronically Stored Information**

It is the position of the Defendants that some digital records of communications between the parties (e.g. emails) are potentially discoverable and relevant in this case and should be preserved for discovery.  Electronic and other discovery may be confidential and contain trade secrets, and discovery of same should be subject to the entry of a two tiered protective order.

Plaintiff Xplor further believes that all digital communications and records pertaining to the revenues derived and expenses paid respecting defendants' internet businesses are discoverable and relevant and should be preserved.

Defendants' believe that a preservation of all digital communications and records pertaining to the revenues and expenses of defendants' internet businesses is overbroad, unduly burdensome in nature, and disproportional. Indeed, such a preservation obligation would include data that is not likely to be relevant nor reasonably accessible under the 2006 revisions to the Federal Rules of Civil Procedure and for which no preservation obligation would apply. Given the ambiguous nature of the status of the complaint on file herein and as to what issues remain it does provide for a challenging determination as to what data is

JOINT CASE MANAGEMENT STATEMENT

or is not relevant and ought to be preserved. Certainly, any and all data, communications, electronic communications, and documents that Xplor and its control group have relevant to their claims and damages and the likely defenses (such as authorization and license) ought to be preserved. Defendants will be in a better position to gauge relevance when it better understands what issues if any remain in the case.

**(4)    Protective Orders/Privilege and Protection of Materials**

The parties believe that a protective order will be necessary to govern documents and information exchanged in discovery and will work with the other parties to draft a protective order acceptable to all parties.

**(5)    Limitations on Discovery/Changes to Limitations Under Rules**

Discovery should be subject to the entry of a protective order to protect trade secrets and other confidential or sensitive information.  The parties will work together toward drafting a mutually agreeable stipulated protective order. The defendants believe that discovery ought to be staged as indicated above with the liability phase first and the damages phase second – which by its nature would impact the schedule below.

**(6)    Other Orders**

The parties are not aware of any other orders that the Court need make at this time.

**III.    Proposed Schedule and Discovery Plan:**

Plaintiff's Proposed Schedule:

Plaintiff proposes a deadline, absent a stipulation from defendants, to file a motion to amend its complaint to add new parties and causes of action by June 27, 2008.

1    Plaintiff proposes a non-expert discovery cut-off date of December 30,
2    2008.
3    Plaintiff proposes an expert discovery cut-off date of January 31, 2009.
4    Plaintiff proposes a deadline to file all dispositive motions by February
5    28, 2009.
6    Plaintiff proposes the trial date be set in June, 2009, with the pre-trial
7    conference in May, 2009.
8    <u>Defendants' Proposed Schedule</u>:
9    Defendants propose a non-expert discovery cut-off of January 15, 2009.
10   Defendants propose an expert discovery cut-off date of February 15,
11   2009.
12   Defendants propose that all dispositive motions be filed by March 20,
13   2009 and be heard by April 30, 2009.
14   Defendants propose a pre-trial conference date in May 2009.
15   Defendants propose that the trial date be set for June, 2009.
16   Respectfully submitted,
17   Dated: May 29, 2008          ROTHKEN LAW FIRM LLP
18
19   _____/s/_____
20   Ira P. Rothken, CA SBN 160029
     3 Hamilton Landing, Suite 280
21   Novato, CA  94949
22   Tel:  (415) 924-4250
     Fax: (415) 924-2905
23   Email: ira@techfirm.com
24
25   Attorneys for Defendants
     Voice Media Incorporated, Trade News NV
26   and Internet Business Services LLC
27
28

492891.1 (N15391.600)      -8-

JOINT CASE MANAGEMENT STATEMENT

Case No.:  2:04-cv-894 CBM (CWx)

1

Dated: May 29, 2008          CLARK & TREVITHICK

2

3              _____/s/_____

David S. Olson, CA SBN 127264

4              800 Wilshire Blvd., Suite 800

Los Angeles, CA 91356

5              Telephone: (213) 629-5700

6              Facsimile: (213) 624-9441

Email: dolson@clarktrev.com

7

8              Attorneys for Plaintiffs

9              Xplor Media, Inc. and New Destiny Internet

Group LLC

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

492891.1 (N15391.600)        -9-

JOINT CASE MANAGEMENT STATEMENT

# EXHIBIT A

**JAMS ARBITRATION NUMBER 1220031509**

**NEW DESTINY INTERNET GROUP, LLC, et al,**

    **Claimants,**

    **And**

**VOICE MEDIA INCORPORATED, et al,**

    **Respondents.**

---

## FINAL AWARD

**Introduction.** This arbitration involves claims between firms involved in internet adult entertainment, claimant New Destiny Internet Group (New), and respondents Voice Media, Inc. (Voice) and Trade News NV (Trade), for breach of a Web Marketing Agreement (Agreement), further described below. New Destiny claimed that Voice had wrongly assigned the Agreement, and also failed to pay New Destiny its full share of revenues due.

After extensive pretrial discovery, and motion work addressing discovery disputes, arbitration hearings were held over several days in April, 2005, David Olson, Lorin Brennan, and Alisa Edelson, appearing for claimant, and Ira Rothken, Jared Smith, and Kirk Retz, for respondents. Following the hearing, an Interim Award was issued, the substance of which is recapitulated below. The Interim Award concluded that Voice's assignment of the Agreement was assented to by New Destiny, and that New Destiny had failed to carry its burden of proving its revenue sharing claim. But, both parties urged the arbitrator to appoint an independent auditor to finally resolve the revenue sharing dispute.

Thereafter, and consistent with the parties' requests, the arbitrator appointed an accounting firm, Stephens, Reidinger & Beller, LLP, as the arbitrator's independent expert, to perform the audit and report back findings. The work was done by Mr. David Stephens and his colleague Mr. Elliot Park. Recognizing that questions had been raised in the first hearing about the sufficiency of Voice's record keeping, the arbitrator eventually

1

instructed Mr. Stephens to report on two issues: First, were Voice's records and procedures sufficient to allow Stephens to make a reliable, conventional determination whether all payments due to New had been made? Second, if the answer was 'no', could Stephens make a reliable alternate analysis of whether amounts were still due from Voice to New?

While Stephens's work was in progress New replaced Mr. Olson and colleagues with Todd Miller and John Farrell as their counsel.

After a process prolonged by difficulties in trying to assemble the necessary records and information, Stephens issued a written report. Thereafter, under ground rules established by the arbitrator, the parties obtained Stephens's working papers, with copies of all materials and information provided to him by each side, deposed Stephens and Parks, and appeared at a hearing before the arbitrator on April 30, 2007. Supplemental briefs were filed both before and after this hearing. At the hearing counsel agreed to extend the deadline for issuance of the Further Interim Award to June 29th. The last brief was filed May 21st.

After securing the parties' written consent to a short extension of time for issuance, the arbitrator on June 28, 2007 issued a Further Interim Award. That Award called for submission of briefs addressing the question who was the prevailing party, and presenting the parties claims for fees and costs. The last of these submissions was received August 15, 2007.

On that same day, the claimants filed an application to disqualify the undersigned, who immediately ordered suspension of the proceedings pending resolution of the application. On January 11, 2008, upon the recommendation of hearing officer Judge William Cahill (Ret.) the JAMS National Arbitration Committee denied the application to disqualify, and directed the undersigned to resume the arbitration.

On February 4, 2008, the arbitrator issued an Order Re Audit Fees and Costs, finding claimants to be the "prevailing party" and inviting submission of an application for audit, attorney, and arbitration fees and costs. The Order is recapped below. Claimant submitted an application for fees and costs, respondents an opposition, and claimants a reply, the last received on about March 14, 2008.

2

The following statement of reasons and Final Award reprises the April 2005 interim award, the June 2007 Further Interim Award, and the February 2008 prevailing party order. It also addresses and resolves the quantum of fees and costs to be awarded, and finally decides the case.

**Statement of the Case.**

The April 2005 Interim Award. The April 2005 Interim Award and statement of reasons is recapitulated as follows.

Xplor, a company owned by Farrell and Moffit Timlake, owns the copyright to a library of adult entertainment videos known as 'homegrownvideo', and to a related internet website, 'homegrownvideo.com'. Xplor has an oral agreement licensing the homegrownvideo.com site to New.

In January 2000 New and Voice entered into the Agreement [Ex. 14]. The Agreement stated that Voice would be responsible for marketing, promotion, and distribution of the homegrown site, and that New would be responsible for maintenance, upgrades, and 'functionality' of the site. Under the Agreement Voice agreed to set up e commerce processing, including a merchant account, and to handle customer service, for homegrownvideo.com website visitors and members. Under the Agreement, Voice housed the homegrownvideo "tour" on Voice's web server, received applications for membership in the site, took credit card numbers from prospective members, arranged for credit card processing, and collected payments from members. Voice also was obliged to pay third parties who provided referrals to the homegrown site.

The Agreement required that Voice share the revenues derived from the collaboration 50-50 with New, after first deducting payments to third parties and marketing and processing costs. The Agreement required Voice to account to New for "all revenues it receives as generated by the Site." It required "the parties to provide one another with monthly reports setting out the cash receipts and other ... financial information relating to the commercial exploitation and operation of the Site ..." It gave each side the right to audit the books, records, and accounts of the other Party. The audit cost was to be born initially by the auditing party, but the other party was obliged to reimburse those costs if the audit disclosed a variance of more than 5% between what was paid and what was due.

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

Assignment of the Agreement by either Party was forbidden without the other's consent.

The Agreement further specified that it would remain in force until terminated by agreement of the parties, or by either party's exercise of a right to terminate upon three specified events: bankruptcy of the other party, issuance of a permanent injunction at the request of a third party preventing use of the site, or acts of dishonesty by the other side. Upon exercise of the specified right of termination, New was entitled to buy Voice's rights in customer information the latter obtained during performance of the Agreement, and if New failed to do so, the information became Voice's property, and New became obliged to continue to provide service to these customers, and also to share revenues with Voice.

The Agreement contained no explicit right to terminate without cause, nor to terminate on grounds other than the specified grounds recited above.

New Destiny's co-owner and general counsel Spike Goldberg signed and sent a letter, on New's letterhead, addressed to Voice's principals Ron Levi and Paul Lesser, dated April 19, 2000 [Ex. 262]. The text of the letter was drafted by Voice's Guy Mizrachi, who asked Goldberg to sign it. Because of its significance in this case, the letter is quoted essentially in full text:

> "When we first began our discussions concerning our joint venture my concern was to have the experience and talent of both of you involved in this project and for you to provide and supervise certain services as part of your commitment to the deal. At that time it did not concern me that your involvement was to be through your company, Voice ... However, I have recently become aware that Voice ... may have some significant business problems. It is my concern that such problems may adversely affect the proposed business.

> "As our primary interest is to have you both as part of this project and to avoid any problems that may result from a direct association with Voice ... we have decided that we do not wish to be involved in an entity that is owned in part by Voice ... If you insist on Voice ... being a participant, we may have to withdraw from the transaction. On the other hand, if you will both participate,

4

whether personally or through a new entity, we shall be more willing to continue with the proposed venture.

"I do not care if this new entity subcontracts with Voice ... or any other company to provide certain of the services that are your obligation to provide. However, the cost of obtaining such services from a third party or company is to be charged to your interest in the new entity."

New offered evidence at the hearing that the letter coincided with efforts by Mr. Levi in mid 2000 to convince the divorce court to reduce his spousal support obligations, based in part on claims that the value of Voice had declined.

In May 2002 Voice sold its interest in its websites to Trade, and Trade assumed management of other sites which Voice previously had managed, including the homegrownvideo.com site [Asset Purchase Agreement, Ex. 260.]

Persons who own and/or operate websites on the internet are known in the trade as "webmasters." A particular website can direct visitors to other websites by means of "links." A link is text or a graphic symbol on a webpage which the visitor can click on with his computer mouse. Clicking the link transfers the visitor to the new, target website.

Trade sought to induce webmasters to include links to homegrownvideo (as well as other sites) on their websites, by offering to compensate webmasters for traffic directed to homegrown video (and to Trade's 'CEcash' website). Webmasters became "affiliates" of Trade, and thus eligible for this compensation, by entering "affiliate" agreements with Trade. Webmasters signed up as affiliates at Trade's own website, by reading the "Adult Webmaster Affiliate Terms And Conditions" posted there [Ex 200002], then clicking the "I Accept" button immediately above the proviso stating "By clicking on the 'I accept' button below ... you are acknowledging that you agree to all of the terms, conditions, promises [etc] set forth in the above Agreement." Webmasters who signed up as Trade's "affiliates" received commissions or fees for persons directed to Trade's "CEcash" website, and also for persons who signed up to become members of the CEcash site.

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

The "Adult Webmaster Affiliate Terms And Conditions" (Affiliate Agreement) prominently stated, in the first sentence, that "you are entering a binding and enforceable contract with Trade News Corp."

Trade offered unrebutted evidence at the 2005 hearing that New's Mr. Goldberg repeatedly visited the Trade News affiliate site. Goldberg testified that he bypassed the Affiliate Agreement "I accept" page described above, by 'hotlinking', and thus never saw that he was entering a contract with Trade. But New's co-owner, Moffat Timlake, testified that he knew it was necessary to click the 'I agree" button to enter into an affiliate relationship. It was undisputed that, pursuant to the Affiliate Agreement which New entered into by clicking "I accept" at Trade's website, Trade paid, and New received, several hundred thousand dollars in affiliate fees, for customers referred from the homegrownvideo site to the homegrownvideo tour on the CEcash site. These revenues were separate from, and in addition to, New's 50% share of revenues under the Web Agreement.

Voice offered undisputed evidence that the New collaboration with Voice/Trade was a fiscal success, with homegrownvideo.com rapidly becoming the most frequently visited and remunerative of the several sites run by Voice. Voice paid New a total of about $1.35 million during the life of the Agreement.

In the arbitration New contended that Voice/Trade consistently underreported and underpaid to New, or "shaved", the revenue share owed to New under the Web Agreement. New claimed Voice/Trade owed New more than $6 million dollars in unpaid revenue share and interest.

Although the Web Agreement required Voice to account to New for the former's share of revenues derived from the site, and gave New the right to an audit, New did not support its claim at the arbitration with the results of any audit.

New did present evidence that it *requested* an audit, in November 2003, and that on January 21, 2004, New's accountant, Blair Mitchell, visited Voice's premises for purpose of *commencing* an audit. Mitchell testified that he did not receive all documents that he requested, and was unable to complete an audit. By letter of February 2, 2004 [Ex. 200005], Voice forwarded additional financial documentation to Mitchell, including processing agreements, webmaster expenses for 2003, and back up sales records for three

6

months of 2002, "as requested." The letter invited Mitchell to contact Voice's Kristi Luhar, "should you have any further questions." Mitchell and New did not tender any follow up questions and did not further pursue an audit. Instead, they initiated this arbitration.

In lieu of audit findings supporting its claim, New offered a species of proxy calculation by its expert, James Christensen. Christensen assumed that *each* active password in New's computer "HT" password file represented a paying member of the homegrownvideo site. He then computed the revenues he claimed New *should* have received, based on this assumption, and subtracted the revenues it actually received to compute damages. In deposition testimony, read at the arbitration, Christensen stated he assumed each "active" member was a paying member "[b]ecause that's what I've been informed by the plaintiffs." (Depo., p. 39-40.) But, New's head computer technician, Norman Day, the only representative of New who testified on this issue, stated on cross examination that he did not analyze whether each "active" password represented a paying member. Instead, he testified, *he* assumed that *Christensen* did this analysis.

Voice and Trade offered plausible evidence of a number of ways that passwords of non paying members are entered or retained in the "active" password base. Passwords are assigned to prospective members who are given free trials in the hopes of inducing them to become paying members; sometimes their passwords are not promptly cancelled when they fail to sign up as paying customers. Third party credit card processors delay, sometimes up to 90 days, in notifying Voice/Trade of cancellation of members for non payment. New's employee Fieldson admitted handing out forty to fifty free passwords to pizza delivery men, and Mr. Day admitted creating 50 to 60 free passwords to use as test accounts. There also was testimony that New's computer password technology was outmoded and inadequate for efficient, accurate synchronization with Voice/Trade's member file, thus failing to remove some cancelled members from the list (New refused to allow Voice/Trade to maintain New's password file on Voice/Trade's server.)

Also, Voice's computer technologist Medhat Mourid credibly testified concerning a member-by-member analysis that he prepared demonstrating that only about 30% of the password holders in New's password file in fact paid membership fees.

7

In about March or April of 2004 New commenced this arbitration, and in July New moved the arbitrator for a preliminary injunction barring Trade from using the homegrownvideo.com tour during the pendency of this arbitration. In response, Trade offered evidence that it had discontinued use of the homegrownvideo.com tour and caused all links to it to be removed from its affiliates' sites. Trade's briefs represented to the arbitrator that Trade had completely discontinued use of the homegrownvideo tour. (The arbitrator nonetheless issued the injunction, finding there was evidence of at least isolated continued use by Trade of the homegrownvideo tour, and that the injunction would not harm Trade if, as it represented, it had voluntarily ceased all usage.)

Voice/Trade proposed during the pretrial phase before the April 2005 hearing that the "shaving" claim be resolved by the appointment of an independent auditor to review Voice's/Trade's books and determine whether additional revenues are owed. They renewed this offer in their opening post hearing brief, suggesting that "a neutral accounting expert be retained [by the arbitrator] paid for by defendants who will come in and do [an] independent analysis of the revenues received and fees paid under the [Agreement] and give an opinion of the accuracy of all such revenues received and payments made to date."

New opposed Voice's proposal for a pre trial audit, and the arbitrator did not order one. Neither side's financial expert claimed to have done an audit. But, New's brief after the April 2005 hearing "request[ed] an accounting under the control of JAMS as to ongoing infringement and shave damages from January 1, 2005 through the present." And, Voice's post hearing brief renewed its own pre-trial proposal for an audit.

The April 2005 Interim Award addressed the claims in issue as follows. New asserted two main claims: *first*, that Voice breached the Agreement by assigning it without New's consent to Trade, which has at all times since been infringing New's copyright; and *second*, that Trade has underreported and underpaid New's share of revenues received by Trade from exploitation of New's site.

With respect to New's first claim, the arbitrator found that New consented to Voice's assignment of the Agreement to Trade. In the April 19, 2000 letter, Mr. Goldberg specifically consented, on behalf of New, to exploitation of the homegrownvideo website by an entity other than Voice. The letter may have been

8

drafted, as Goldberg testified, by Voice's Mr. Mizrahi. But, there is no evidence that Goldberg was coerced into signing the letter, or signed unaware of its plain meaning. The letter explicitly states that New has no objection to collaborating with Mr. Levy and Mr. Lesser through a "new entity." And, the force of the letter as an expression of New's intentions is undiminished by evidence that, from the Voice side, Mr. Levi may have been engaged in some effort to diminish his spousal support obligations.

Further, the arbitrator concluded that New assented again to Trade's role in exploiting the homegrownvideo website when New joined Trade's affiliate program and commenced receiving payments from Trade for homegrown customers that News directed to Trade. Under the Affiliate Agreement, New knowingly sent persons who visited the homegrown site to view the homegrown tour on Trade's server, and received substantial additional compensation in return for doing so. In doing so, New implicitly consented to Trade's use and exploitation of New's copyrighted material. The arbitrator does not credit Mr. Goldberg's testimony that he was unaware Trade was the counter party to the Affiliate Agreement, and in any event, New is bound by it.

Neither side purported to terminate the Agreement under its termination clause, or on the grounds specified therein for termination, and none of those grounds was present. Therefore, neither side is entitled to invoke the remedies specified in the termination clause.

Further, each side repudiated the Agreement by its actions in these proceedings. New repudiated the Agreement by seeking and obtaining an injunction which prevented Trade from continuing use or exploitation of the homegrown site and thus from continuing performance of the Agreement. The Voice/Trade side repudiated the Agreement by voluntarily causing the removal of the homegrownvideo banners and links from affiliate sites, and ceasing all promotion of the site, prior to the issuance of an injunction requiring that it cease such promotion.

The arbitrator also found that New had failed during the April 2005 hearings to prove by a preponderance of evidence that Trade "shaved" the revenues from exploitation of the site. New's expert Christensen relied on his client for the assumption that each active password represented a paying site member, but the only representative of New who testified about this, Mr. Day, said he formed no conclusion on this point, and instead

9

relied on Mr. Christensen. Further, the other evidence presented by Trade raised substantial doubt about the reliability of Christensen's central assumption that each "active" password holder was a paying member.

The June 2007 Further Interim Award. In light of both parties' requests, at the end of the 2005 hearings, that the arbitrator allow the contractually required audit, the arbitrator refrained from entering a final award, and instead engaged Mr. Stephens and commenced the process described at the beginning of the present award.

The Further Interim award addressed the independent audit and resolved claimant's claim for "shaving damages" based on that audit, as more fully described below.

The Independent Audit. The arbitrator selected Mr. Stephens, after notice to the parties, based on the arbitrator's previous observations of Mr. Stephens' work, on another project, over the course of several years. Based on this experience, as well as his review of the firm's work in this case, the arbitrator believes Mr. Stephens and his firm to be both highly competent and reliable. Neither side objected to appointment of the Stephens firm, and neither side has criticized either its competence or neutrality in these proceedings.

Mr. Stephens and Mr. Park reported their findings in a memo dated November 9, 2006. Park did most of the field work on the assignment; Stephens was the senior accountant. They elaborated their findings in their deposition testimony. They selected at random four test months for their analysis, August and November 2003, and January and April 2004.

Stephens's first conclusion was that Voice's books were incomplete and its internal financial controls deficient to the point that verification of revenues received by Voice (thus New's 50% share) was not feasible by conventional means, i.e., examination and testing of financial statements, general ledgers, and the like.

Stephens was able to compare several of Voice's credit card processors' records with the revenue reports Voice sent to New, in an attempt to verify that revenues as reported by processors matched those reported by Voice to New. The limited records available for review revealed no withholding of revenues by Voice. But, several of the processors are defunct, and data could not be obtained from their records. Further, Voice

10

did not retain copies of processor records. Without this information Stephens was unable to attest that all revenues owed were paid.

Stephens also attempted to pursue, with the arbitrator's express blessing, alternative analyses intended to attempt to determine whether revenues had been withheld. These are discussed below.

'Missing Member' Analysis. Stephens first attempted to test New's theory that Voice was collecting, as revenues allegedly generated by its other websites, monies in fact attributable to sales of memberships on the New Destiny site. This theory rests centrally on comparison of a list of user names kept and provided by New of people who signed up for its site, with user names in Voice's data base for its other sites. If a user name for a New customer was designated "AN" or unbillable by Voice for the homegrown site, but Voice then collected from a customer with the same user name for another Voice site, New posited that this user or "missing member" of homegrown should also be counted as billable for New.

Stephens assumed that an identical user name associated with the same zip code on New's list and Voice's list for its other sites was in fact the same customer. And, Stephens further assumed that a customer who paid Voice also was 'billable' (and collectible) for the homegrown site as well.

Based on the four sample months, Stephens concluded that the average monthly revenue associated with these 'missing members' was about $5,400 [Ex. I to Stephens' November 9, 2006 report], of which $2,700 would be New's share. Extrapolated across the approximately 54 month damage period (January 2000 through June 2004), this produces a total damage to New of $145,800.

Voice attacked this analysis on several grounds. It argued that there may be legitimate explanations why the same customer could be billed and pay for his Voice but not his homegrown membership. For example, his credit card might have been cancelled after he signed up for Voice but before he signed up for homegrown. Voice also belatedly urged that the actual charge per sign up is less than the full $46 nominal amount.

The arbitrator concludes that New is entitled to recover "missing member damages." There may have isolated instances where someone with the same user name

11

and zip code could pay for the Voice site but not New's site. But, there is a strong inference that persons who paid for one could pay for the other. And, Voice's challenge to the amount of the per-head charge is untimely.

The arbitrator will award the full $145,800 indicated by Stephens's analysis.

Expense Reallocation. In a further attempt to test the propriety of Voice's revenue sharing with New, Stephens considered whether Voice overstated expenses allocated to New in computing its revenue share. Voice allocated expenses among its several websites based on the number of signups per website. But, many initial signups do not lead to an actual sale of a paying membership.

Stephens posited that, because revenues are shared based on actual receipts, expenses too should be allocated based on actual sales rather than sign ups. Stephens found that the percentage of customers who signed up for New's homegrown website and then actually 'converted' to a sale was substantially lower than for Voice's other sites [Stephens Report, Ex. H]. Therefore a reallocation of expenses should be made based on actual sales, resulting in a lower expense allocation to New, and additional monies owed to New by Voice.

Voice faulted this expense reallocation analysis on the grounds that Stephens considered only four Voice programs, and failed to include expenses for all 16 programs Voice operates. If the expense allocations are recomputed using all 16 programs, then, it argued, no reallocation is required, and no damages are due based on this analysis. Voice provided data for the additional programs to Park during his deposition [Ex. 2 to deposition]. Park acknowledged that his analysis was predicated on four programs only, and that inclusion of the additional 12 programs would or could change the results.

Subsequent to the hearing April 30, 2007, the arbitrator asked Park to recompute the expense reallocation based on the data supplied by Voice during Park's deposition. Park did so, and the results were supplied to counsel, who were provided an opportunity to respond. Park's new computations indicate an average monthly adjustment (reduction) of $5,272 in expenses allocated to the homegrown site. This adjustment, if implemented, would indicate additional site revenues for the damage period of $284,688, of which New's share would be $142,344.

12

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

The arbitrator's invitation to the parties to respond to Park's revised calculations produced a flurry of briefs and motions, but consideration of these is mooted by the arbitrator's conclusion that damages should not be awarded based on the expense reallocation analysis.

Stephens report stated that "the *best* way of allocating ... Program expenditures is based on actual collections." (emphasis added.) The report did *not* conclude or assert that anything in Generally Accepted Accounting Principles, or law, or the Web Agreement, *required* allocation on this basis. New did not elicit any testimony from Stephens or Park that GAAP, or law, or the contract required this method of allocation. Nor did it make any other showing that this is the case. The arbitrator finds nothing in the Agreement requiring any particular method of expense allocation.

Thus, Stephens' proposed reallocation simply reflects an exercise of accounting judgment about best practices. To confirm this, the arbitrator queried Stephens on the point. His recent email response in material part stated:

> "Since expenses were not assigned to programs on a direct basis (which would have been the most accurate method), the allocation of expenses based on sales appears to us to the *preferable* allocation method. *GAAP does not require this method ... It is not mandatory and there is discretionary accounting judgment involved in the selection of the method of allocating expenses.* ... We believe that the allocation based on sales is the best method available in this situation."
> (Email, Stephens to Arbitrator, June 19, 2007, emphasis added). [The arbitrator was entitled to privately consult an independent expert, *Association of Mexican American Educators v California*, (9th Cir 2000), 231 F3d 572, 590-591 (en banc), but in this case all Stephens's work was disclosed to the parties, who were afforded full opportunity to cross examine]. )

The arbitrator will not award damages based on the suggested reallocation. The arbitrator is mindful that the legal standard for proof of the *quantum* of damages is relaxed once the *fact* of damage has been shown. But this rule does not justify awarding sums which are not shown by a preponderance of evidence to be damages.

Here, expense reallocation was never advanced by New as a damage theory before Stephens posited reallocation as an adjustment. The reallocation proposal resulted

13

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

only from Stephens's diligent efforts to find a substitute for auditable financial records. Cost allocation issues in accounting are notoriously difficult and frequently elude definitive answers. The allocation method actually used by Voice has not been shown to be in breach of the Web Agreement, or applicable law, or GAAP. New might have ferreted out the allocation method Voice was using by an early exercise of New's audit rights, and sought negotiated or adjudicated relief changing the allocation method. But it did not seek an audit or accounting at any time from inception of the Agreement in 2000, and opposed Voice's motion for an early, pre-trial audit after the arbitration commenced in 2004. Under these circumstances it is not unfair to deny New damages based on an accounting cost reallocation.

Reality Check. As a final note on damages, Stephens's work provided a convincing reality check. New asked for $6 million or more in damages, and litigated the case accordingly. Stephens's analysis showed this claim to be an order of magnitude too large, even had the arbitrator adopted expense reallocation as a damage theory ([$145,800 + $142,000] =$287,800 =4.7% of $6 million), and even if the arbitrator had awarded the high-six-figure quantum of expense reallocation damages New recently proposed in one damage scenario recently submitted.

Stephens' work is essentially consistent with the conclusion in the Interim Award that New had failed to prove shaving damages. Also, nothing in Stephens' analysis suggests that Voice or Trade withheld or even possibly could have withheld revenues on the order of magnitude for which New has contended.

Damages are awarded in the amount of $145,800 based on the missing member analysis. Additional damages are denied.

Injunction. New requested the issuance of a permanent injunction.

A preliminary injunction was issued early in the arbitration, but New made no showing that any alleged unlawful conduct is presently occurring, or is likely to occur in the future.

The request for a permanent injunction is denied.

Fee Entitlement--The February 2008 Fee Order. The June 2007 Further Interim Award invited submission of briefs re which party was entitled to recover fees and costs.

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

Following the submission of briefs, the arbitrator addressed this question in the February 4, 2008 Order Re Audit Fees And Costs, recapitulated as follows.

Claimants seek to recover their audit fees. The "Financial Terms" paragraph of the parties' Agreement specifies that either party may audit the other's books, and if the audit reveals a variance exceeding 5% between what was paid and what was due, the auditing party will recover its auditing costs. The audit here was instigated by claimant, through the arbitration proceeding it commenced, and as a result claimant has recovered additional sums exceeding 10% of the amounts paid by respondents.

So, claimants are entitled to recover their audit fees.

Claimants also seek reimbursement of their litigation costs, under the Governing Law and Jurisdiction paragraph of the Agreement, which specifies that the prevailing party in an arbitration under the Agreement shall recover its reasonable attorneys fees and costs. Claimant cites California Code of Civil Procedure section 1032(b), which provides that the "prevailing party" for purposes of recovering costs is the party which obtained a net monetary recovery—in this case, claimant.

Respondent argues that CCP section 1032 doesn't apply in the arbitration, which instead is governed by JAMs Rules. But, the dispositive question is the parties' intent: what did they mean by the phrase "reasonable attorneys fees and costs?" This formula is in widespread use as a reference to those costs recognized by the statute as recoverable, and the most reasonable inference is that the parties meant the phrase to refer to those fees and costs usually recoverable in California suits. And, as the party obtaining a net monetary recovery, claimant is entitled to recover its costs under CCP 1032(b).

The same section also entitles claimant to recover reasonable attorneys' fees, which are enumerated as among the statutorily recoverable costs when, as here, they are provided for in a written agreement.

Respondent argues that claimant did not "prevail" because it recovered only a fraction of the sums claimed. The "net monetary recovery" rule defeats this analysis. Respondent also argues for statutory fees under the copyright act. But the gravamen of the case was breach of contract, not copyright.

15

Following the issuance of the foregoing order, the parties submitted briefing and evidence quantifying the audit, attorney, arbitration, and expert fee claims. The arbitrator has carefully reviewed these materials, and rules on the claims in the next section below.

Rulings On Fee And Cost Claims.

What New Seeks. The following summary of the fees and costs New seeks is copied directly from its memorandum supporting its fee claim:

1.    Audit Fees[1]
      Blair Mitchell Accountancy (New Destiny Auditor)           $120,900
      Christensen & Co. (New Destiny Auditor)                    $ 26,838
      Stephens, Reidinger & Beller (Independent Auditors)        $ 28,706

                 Subtotal Audit & Expert Fees:           $176,444

2.    Statutory Costs:
      Deposition Expenses                                        $ 38,104
      Photocopying & Exhibits                                    $ 31,729
      JAMS and Arbitrator's Fees                                 $ 42,946

                 Subtotal Costs:           $112,779

3.    Attorneys' Fees:
      Saltzburg, Ray & Bergman (Initial Counsel
         Nov., 2003-March, 2004)                                 $ 13,906
      Kulik, Gottesman, Mouton & Seigel (Lead
         Counsel February, 2004-July, 2006)                      $588,153
      Fish & Richardson (Lead Counsel
         August, 2006-August 2007)                               $385,687
      Law Offices of Lorin Brennan (Co-counsel
         February, 2004-February, 2008)                          $240,125

                 Subtotal Attorneys' Fees:           $1,227,871

      **Total Fees and Costs:[2]**                          **$1,517,094**

Additional Evidence Relevant To Fee And Cost Claims. Most of the evidence relevant to decision of these issues appears in preceding parts of this writing. One fact

16

not previously mentioned is that Voice offered to settle the case shortly before the plenary hearings began in April 2005, for $100,000.

Audit Fees. As noted above, the Agreement entitles New to recover audit fees when an audit produces additional revenues in excess of 10% of those reported. That threshold is met here.

New therefore is entitled to recover its share of the fees paid to Mr. Stephens' firm, $28,706.

The charges for work of Mr. Mitchell and Mr. Christensen are partly for audit work, partly for expert work. The latter component is discussed below. As for the audit component, it was not known until far down the road that an independent auditor would be retained, so it was reasonable for New to pay its own auditors for assistance in pursuing an audit of the shave claim. Mr. Stephens' total fees of $57,412 provide a benchmark for the reasonable cost of an audit in these circumstances. New is awarded this additional sum in compensation for monies paid to Mitchell and Christensen for audit work.

The total monies awarded as audit costs are $86,118.

Standards For Attorney Fee And Expert And Cost Claims. The following principles govern the application.

First, as established in the prior order re fees, the "net monetary recovery" rule dictates that New be found the prevailing party.

Second, the Web Marketing Agreement provides that the prevailing party in a dispute thereunder shall recover its *reasonable* attorneys' fees and costs, including expert fees (p. 5.)

Third, consistent with the contract provision just quoted, statutory and case law independently requires that fees and costs awarded be "reasonable" or "reasonably necessary to the conduct of the litigation" and "reasonable in amount." CCP 1717, 1032, 1033(c)(1), (2); *Perko's Enterprises v RRNS Enterprises* (1992) 4 Cal App 4th 238, 245; *PLCM Group v Drexler* (2000) 22 Cal 4th 1084, 1094-95 (equitable principles govern fee awards).

Fourth, trial judges (and by analogy arbitrators) have broad discretion to determine what fees are reasonable:

17

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

"[t]he 'experienced trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong.' ..." ( *Serrano v. Priest* (1977) 20 Cal.3d 25, at p. 49, citations omitted.)

Fourth, fees incurred for prosecution of unsuccessful claims should not be allowed. *Sokolow v County of San Mateo* (1989) 211 Cal. App. 3d 231, 250.

Fifth, fees incurred to obtain relief that was offered without the necessity for adjudication, or that was offered in settlement, may be disallowed. *Serrano v Unruh*, (1982) 32 Cal 3d 621, 633, 639; *Meister v Regents of U of C*, (1998) 67 Cal App 4th 437, 455.

Sixth, the assessment of what is reasonable properly may include consideration of the amount of fees claimed in relation to the amount in controversy, and success achieved (*Meister, supra*, affirming trial court award of $75,000 to attorney claiming more than $500,000 in fees; trial court (special master) ruling noted: "the very limited success achieved" and "the amount of the monetary component of the judgment.")

Analysis Re Fee And Cost Issues. Despite the fact that New is the nominal "prevailing party", a number of important considerations point to a drastic reduction of the fees and costs it claims.

First, New was the losing party on a major part of the case. Its claim for wrongful assignment of the Agreement, and the related trademark violation claims, for which New sought millions in damages, were rejected outright. The authorities, noted above, hold that fees and costs should not be awarded for pursuit of unsuccessful claims.

Second, and despite its technical victory under the "net monetary recovery" rule, New as a practical matter also was the loser on the "shaving" claim, recovering only a fraction of the sums it claimed.

Third, New was offered the chance to settle the case before trial for $100,000, nearly equal to its eventual recovery.

Fourth, it cannot be said that the resources devoted to this case--$1.2 million for the services of four different law firms, and more than $100,000 for the forensic fees of the two accountants—were reasonably necessary to pursue the case, given the real

18

magnitude of the sum in controversy. It is neither reasonable nor equitable (*PLCM, supra*) to make an adversary pay \$1.2 million spent chasing a \$145,000 claim, or for that matter, a \$750,000 claim (in the Fish firm's later damage submissions alternate damage scenarios placed a possible "shaving" award in this range.) Contingent fee lawyers, who risk receiving *no* fees, seldom if ever are paid more than 50% of what they recover. New here asks for fees and costs totaling about ten times its monetary recovery.

Surely the word "reasonable" is inserted in fee clauses for the precise purpose of protecting losing parties from being forced to pay exorbitant fees to an adversary who has miscalculated the value of his claim and devoted excessive resources to its prosecution.

New has consistently argued that Voice forced the high expenditures here by its failure to keep records and to cooperate with New's early auditing efforts. There is a kernel of truth here. Stephens' work confirmed that Voice's books lacked the information and controls necessary for a conventional audit, and it took Stephens many months of persistent efforts to complete his work.

But, at the end of the day, Stephens' work supported the conclusion in the initial interim award, that no large "shave" had occurred. Nothing in Stephens' analysis suggested even a suspicion that a seven figure "shave" might lie concealed somewhere in Voice's inadequate records. And, Stephens was able to complete his assignment and provide his analysis for a total of \$56,000 or so in auditing fees.

Also, there is a strong argument that the forensic work of Mitchell and Christensen was not essential to New's ultimate recovery. The Interim Award, rendered after Mitchell and Christensen testified, denied any recovery on the shaving claim; it was only the subsequent Stephens audit that produced the 'net monetary recovery.'

Under all these circumstances it is not reasonable to award New more than a fraction of the attorneys fees and expert fees sought, just as New obtained only a fraction of the relief it sought.

The arbitrator in the exercise of his discretion awards New \$200,000 in attorneys' fees. This sum exceeds the damages recovered, and is justifiable only because of the poor state of Voice's accounting records and the difficulties New encountered as it pursued this aspect of the case.

19

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

As to the "expert" component of Mitchell's and Christensen's bills: the award of a portion of their fees as audit costs, above, fully compensates for the reasonable value their work contributed to the outcome. No additional monies are awarded for their "expert" work.

<u>Costs.</u> New's claimed costs are excessive in light of the value of the relief obtained. The arbitrator in his discretion awards costs of $50,000.

<u>Other Claims And Defenses.</u> All claims and defenses not specifically discussed above are rejected.

<u>Recapitulation Of Final Award.</u>

| | |
|---|---|
| Damages: | $145,800 |
| Audit Costs: | 86,118 |
| Attorney fees: | 200,000 |
| Costs: | 50,000 |
| TOTAL: | $481,118 |

New Destiny is awarded the total sum of $ and New Destiny is entitled to a judgment in this amount, together with interest from this date at 10% until the judgment is paid.

This is intended to be a final award, subject to confirmation by the appropriate court. This final award is rendered on the dated set forth below.

The Case Manager, Christy Arceo, is requested to promptly issue this final award to counsel for the parties.

Dated: April 11, 2008

By: _Richard C Neal_
Hon. Richard C. Neal (Ret)
Arbitrator

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

## PROOF OF SERVICE BY FACSIMILE & U.S. MAIL

Re: New Destiny Internet Group, LLC, et al. vs. Voice Media Incorporated, et al.
Reference No. 1220031509

I, Christy Arceo, not a party to the within action, hereby declare that on April 18,

2008 I served the attached FINAL AWARD on the parties in the within action by facsimile and

depositing true copies thereof enclosed in sealed envelopes with postage thereon fully prepaid, in

the United States Mail, at Los Angeles, CALIFORNIA, addressed as follows:

David S. Olson Esq.
Clark & Trevithick
800 Wilshire Blvd.
12th Floor
Los Angeles, CA 90017
Tel: 213-629-5700
Fax: 213-624-9441

Ira P. Rothken Esq.
Rothken Law Firm
3 Hamilton Landing
Suite 224
Novato, CA 94949 USA
Tel: 113
Fax: 415-924-2905

Norman Day
Homegrown Video
8969 Irvine Center Dr.
Suite 200
Irvine, CA 92618 USA
Tel: 949-716-8080
Fax: 949-716-8081

Kirk J. Retz Esq.
Retz & Hopkins, LLP
21535 Hawthorne Blvd.
Suite 200
Torrance, CA 90503
Tel: 310-689-7037
Fax: 310-316-8100

David R Stephens
Stephens, Reidinger & Beller LLP
1301 Dove St.
Suite 400
Newport Beach, CA 92660 USA
Tel: fax: 949-936-4301
Fax: 949-752-1883

Todd G. Miller Esq.
Fish & Richardson P.C.
12390 El Camino Real
San Diego, CA 92130 USA
Tel: 858-678-5070
Fax: 858-678-5099

I declare under penalty of perjury the foregoing to be true and correct. Executed at

Los Angeles, CALIFORNIA on April 18, 2008.

Christy Arceo